Filed 8/30/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B320116 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. YA098195 |
| FLOR DE MARIA MEJIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott T. Millington, Judge. Affirmed.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In the dark of night, Flor de Maria Mejia hit a bicyclist and kept driving. The impact smashed Mejia's windshield and the flying glass injured Mejia. Three minutes later, she drove by a parking control officer who saw the shattered windshield, looked

at Mejia, and later identified Mejia as the driver and the only person in the van.

Mejia sped away to her boyfriend's place and the two of them immediately burned the van.

After dawn, Mejia sought medical care, claiming this same boyfriend had beaten and raped her. Mejia, however, refused to submit to a rape examination. Her injuries were consistent with those a driver would suffer if a flying body had smashed her windshield.

After the medical visit, Mejia left for Nevada because she was "scared."

Inside Mejia's burned van police found the bicyclist's backpack, scorched but identifiable. Police also found Mejia's apron from the restaurant where she had been working hours before her hit-and-run.

The jury convicted Mejia of violating the statute prohibiting flight from an injury accident. (Veh. Code, § 20001, subd. (b)(2).) The court sentenced her to three years. We affirm. Undesignated code citations are to the Penal Code.

I

Events began September 1, 2016, and continued through the early morning hours of the following day.

A

Mejia clocked out of work at Roscoe's Chicken and Waffles at 9:18 p.m. on September 1, 2016. She was driving her mother's gray Dodge van.

At 1:18 a.m. on September 2, this van collided with 20-year-old William McGill on a bicycle, according to surveillance video from a business that fixed the exact moment of impact. The parties stipulated this van hit and killed McGill. Exactly *when*

2

McGill succumbed to his crash injuries was a significant question, as will appear.

At 1:21 a.m. — only three minutes after the crash — parking enforcement officer Paula Cook was at a red light a few blocks from the collision when she saw the van with a "caved-in," "busted," "shattered," windshield that looked "like it was crashed." Cook made eye contact with Mejia, who was driving the van. Mejia saw the words "Inglewood Parking Enforcement" on Cook's car and hit the gas. Cook observed Mejia for three to five seconds at a range of about four to ten feet. Cook called police to describe the van, but described the driver as a Hispanic *male*.

After hitting McGill at 1:18 a.m., Mejia at 1:30 a.m. sent her mother a Facebook message saying, "Mommy, please help me." Over the next fourteen minutes, Mejia sent three more messages: "Mommy," "Pick me up please," and "Call the police now."

At 2:24 a.m., a passerby reported McGill's body to police. Paramedics arrived and took McGill to a hospital.

At 2:40 a.m., police got a call about a burning van in a different part of the city. Officers found Mejia's mother's van in flames. In the van were McGill's backpack and Mejia's apron from Roscoe's.

Doctors at the hospital pronounced McGill dead at 2:52 a.m.

B

Mejia made four statements to police. We detail these statements, which were elaborate and kept evolving.

1

Hours after the collision, a little before 7 a.m. on the morning of September 2nd, Mejia and her mother dialed 911.

This 911 conversation was the first statement Mejia made to law enforcement. This was the only statement in which Mejia's mother participated.

On the 911 call, Mejia's mother claimed Mejia's boyfriend Erskine Carter had taken the van without her permission. The mother also claimed that Carter had been striking Mejia, and that Mejia said Carter burned the van. When the operator asked where the van had been burned, the mother passed the phone to Mejia. Mejia told the operator she did not know where the van was, nor did she know Carter's home address. The mother said Carter had said he was going to shoot up where she lived.

On the call, Mejia and her mother can be heard asking each other what to say. When the mother said that they wanted to file a police report and that Mejia was beaten up, the operator said she would send a patrol car over.

2

Responders to Mejia's 911 call spoke to her at 7:42 a.m. on September 2, 2016. This was Mejia's second statement to police.

Photographs showed Mejia had some swelling, redness, and bruising on her face, red marks in the center of her chest, some marks on her legs, a scratch on her thigh, a bruise on her back, bruising on her arm, marks on her thigh, and a cut on her palm. Pictures showed the injuries were not serious. The injuries appeared to be consistent with those a driver would suffer if a body hit and broke the windshield, jolted the driver against her seatbelt, and cut the driver with windshield glass. Mejia also had a faint human bite mark on her lower left leg that a traffic collision could not have caused. As she phrases it in her brief, Mejia "declined to participate in a SART exam, otherwise known as a rape kit."

4

Mejia gave officers a long and involved story.

Mejia told officers Carter beat her while she was driving. She claimed she stopped the car, Carter forced her out and left her, and then he came back.  After Carter returned, according to this story, Mejia got back in the car, then Carter left her again, without her clothes, but she was able to get back in again.  Mejia said Carter stopped to buy cigarettes and eventually drove to his grandmother's house.  Outside the grandmother's house, Mejia was crying loudly.  Carter and a friend who was there, Flacco, told her to shut up.  Carter then forced her into the back of Flacco's car, told her he should have let Flacco shoot her, and then raped her.  Carter then drove the van while Flacco drove his car with Mejia in it to a gas station.  Carter and Flacco then burned the van.  When they returned to Carter's grandmother's house, Flacco left for a few hours.  About 6:30 a.m., Mejia began walking home.  Mejia ended this account by saying Carter followed her and hit her again.

The officers told Mejia the van was involved in a fatal hit-and-run.  She denied involvement.

Mejia departed for Las Vegas.  She messaged that "I left to Vegas cuz I was scared[.]"

A few days after the collision, Mejia sent an article about the hit-and-run to several of her friends on social media.

Several of the messages she sent with the article were deleted before police obtained a search warrant for them.

With our emphasis, Mejia messaged a friend, "I try to think positive and I can't . *I'm guilty* .  I just don't know what to . every day it feels worse and worser[.]"

Mejia and Carter had the following exchange on social media about a month after the hit and run:

5

Mejia: If u care for me so much, why u hit me ? That night u lit my car on fire ?

Carter: Bkhuz you was fucking beating me niggah bkuhz I didn't let you drive.

Mejia: What type of man puts there hand on there girl when she's drunk shm

. . .

Carter: You was kicking me all in the fucking face

Mejia: So what if I hit u

Mejia: That never gives a man the right to hit there girl

. . .

Carter: You think it's right for you just to hit on me an not do nothing

Mejia ended the conversation with "Sweet dreams[.]  I'm sorry but I'm gonna make ur life a living hell[.]"

About a week after that conversation, Mejia messaged Carter, "U keep telling me you funna [sic] come and I think u taking ur time so u can kill me and no one will suspect u[.]"  Carter responds, "Lmfaoooooo wtf where did that come from," but then says, "If I want it to kill you I would of did it in the back of ma house when rob asked me[.]"  Rob was Flacco's real name.

On September 7th, officers showed witness Cook a six-pack of pictures of Hispanic men that included Mejia's brother.  Cook circled *two* pictures, including Mejia's brother, stating one picture looked more like the driver.  This photo was of Mejia's brother.

Police showed Cook a second six-pack.  These photos were of Black men.  This photo spread included Mejia's then-boyfriend Carter.  Cook did not identify anyone.

6

Weeks later, police showed Cook a third six-pack. These images were all of women, and one was Mejia. Cook immediately identified Mejia as the driver.

Cook testified the driver was alone in the van. She stated that, in the first six-pack, she was not certain either of the pictures she circled showed the driver, but she *was* "certain that the facial features looked like the driver." She testified she did not select a photo from the second six-pack because she did not recognize anyone. Cook testified that, when she identified Mejia in the third six-pack, she was certain that picture showed the driver "[b]ecause of the face. The contact I had, my memory of the face when we locked eyes I knew that was the face as soon as I saw it." She said the intersection was "pretty lit," but "[i]t was dark in the car so I couldn't see hair, but I just saw the entire face."

Cook identified Mejia in court. Cook said "[s]he does not need to take her mask off."

3

Mejia's third statement to police was weeks after the accident. Police asked to speak with her about the report she filed against Carter alleging he assaulted and raped her. In reality, they were investigating the hit-and-run. Mejia returned from Las Vegas and went to the police station.

Before this interview, Mejia posted what appeared to be a picture taken while walking into the police station with the caption "Might be my last day of free dumb [sic]." An officer took a screenshot of this post, which Mejia later deleted.

During this third statement, Mejia spoke with Inglewood traffic investigator Ryan Green. One Sergeant La Greek accompanied Green. Police audiotaped this statement. This

7

interview is about 90 minutes in duration. The jury heard the tape and saw the 92-page transcript.

In this third statement, Mejia gave officers another involved account.

Carter met her at work. She had a beer with co-workers after work. Mejia was driving and accidentally called Carter by her ex-boyfriend's name. Carter hit her and pulled her hair. Mejia pulled over, and Carter forced her out of the car and drove off. Carter came back and Mejia got back in the car. Carter drove to a Jack-in-the-Box where he forced Mejia out of the van again, took her dress, and left her naked in the parking lot. He came back, Mejia got back in the car and put her dress back on, and Carter drove to his grandmother's house, where he continued to beat Mejia. Mejia told Carter she wanted to go home, but he would not let her. When they got to his grandmother's house, Carter put Mejia in his friend Flacco's car because the van did not have child locks. Eventually, Flacco and Carter got in the car and drove to a gas station where they filled up a red gasoline container. They drove back to the grandmother's house to get the van. Carter drove the van while Flacco followed in his car with Mejia. Carter then doused the van in gasoline and set it on fire. They drove back to the grandmother's house. Carter later gave Mejia her tablet back, and she was able to call her mother on Facebook.

The officers then confronted Mejia with evidence of the hit-and-run. They said she must have been in the car when the accident happened or seen it. She denied it. They also brought up that she had not mentioned the rape in her recounting of that night. Mejia affirmed it had happened but said she did not want to talk about it, though she said she would testify about it.

This concluded Mejia's third statement to police.

In September 2017, about a year after the hit-and-run, Mejia had a daughter with Carter.

4

On May 9, *2018*, Mejia decided to go to the police station to speak again with Green. Police recorded this conversation. The transcript of this interview spans 49 pages and culminates in Green arresting Mejia. The jury watched this videotape and read this transcript.

In this fourth statement, Mejia gave a version of events that changed in the middle and that differed from her earlier statements.

The interview began with Green giving Mejia *Miranda* warnings and with Mejia signing a document waiving her rights.

Mejia told Green she wanted copies of the police reports she filed against Carter so she could get restraining orders against him that would help her get sole custody of her daughter. She also wanted to know if Carter had been interviewed or charged.

Mejia told Green that Carter told her he had hit McGill with the van and had threatened to kill her and her family if she mentioned this to anyone. Mejia claimed Carter conveyed these facts and threats via texts to her old phone, which she did not bring to the interview.

Green told Mejia "it's pretty clear that what you're telling me today is not the truth." Green said a witness had identified *Mejia* as the driver.

Green and Mejia then went back and forth for about two dozen transcript pages: Mejia kept insisting *Carter* had killed McGill, and she just wanted justice for McGill, and Green kept

9

accusing Mejia of lying. Mejia became emotional and repeatedly broke into tears.

Green told Mejia he was going to arrest her that day for felony hit-and-run.

Mejia abruptly changed her story: "I was in the passenger seat."

Mejia claimed Carter said, "I'm gonna show you [Mejia] better than I can tell you," and — to threaten Mejia — swerved the van to hit McGill deliberately.

Mejia described how the whole thing began.

She said, after getting off work, she had a few drinks with her co-workers, picked up Carter, and they went to the beach. When driving back from the beach, Mejia got lost. Carter became angry, said Mejia was drunk, and took over driving. Mejia screamed at him she wanted the car back. He forced her out of the car, took her dress, left her in undergarments in the middle of the street, but then returned and picked her up. As they were driving, Mejia hit him. They yelled at each other. Carter then pointed out McGill on the bicycle, and said he would show Mejia better than he could tell her. According to Mejia, Carter "gassed it and hit the boy . . . ." She said Carter "swerved to the right" to hit the bicyclist on purpose.

Mejia claimed she was in the passenger seat when the van hit the bicyclist. "The backpack flew in and I was screaming, 'Stop, you killed that boy.'" Mejia claimed Carter drove "straight to his grandma's house."

Green said, "So now you're telling me you were there."

Mejia replied, "Yes and I lied because, um, I was scared because his family was threatening me of killing me and my family. And now, I'm fucked and now, I don't know."

10

Mejia claimed *now* she would tell Green the truth. Green said he "would love to hear the truth. Be the first time I've heard it."

Mejia said Flacco and Carter put her in the back of Flacco's car, and Flacco pointed a gun at her and said they were going to kill her, but Carter said not to do it. Carter drove the van and Flaco followed with Mejia in his car while they set the van on fire. Carter kidnapped Mejia all night until morning when Mejia was able to call her mom. Carter told Mejia he would kill her and her family if she said anything about what happened.

Green told Mejia the video showed the driver did not swerve to hit McGill. Mejia continued to insist Carter had been the driver. Green arrested Mejia, which ended the interview.

C

Green interviewed Carter in March 2019. Carter said, on the night in question, Mejia had come to his house late at night crying and screaming. His grandmother, with whom he lived, told him to get Mejia to leave. Carter said Mejia was drunk and said she had hit the van. He said she eventually drove off but posted on social media the next day that Carter had been involved in a hit-and-run in her car. Carter eventually admitted helping Mejia burn the van, but insisted that Mejia had not told him about the hit-and-run.

Carter said Mejia was the one who had driven to the gas station, poured gas on the van, and thrown a flaming lighter on the van. Carter said he ran home and Mejia walked to her house.

Green interviewed Carter's grandmother, who remembered Mejia coming over late at night, and said Carter never left.

Carter testified at Mejia's trial. He said 50 percent of what he had told the police in the interview was a lie. He admitted to

11

the conversation with Flacco about killing Mejia but claimed not to remember why they had discussed it. Carter denied driving when the van hit McGill. He claimed not to recall who had suggested setting the van on fire. He did admit he had poured the gas and torched the van. He said Mejia did not tell him what happened until a few days later. On cross examination, Carter admitted surveillance video showed him driving the van at 10:30 p.m.

## D

The judge granted a motion in limine prohibiting the prosecution from mentioning whether McGill was alive after the time of the collision. During closing argument, the prosecutor violated this court order. Defense counsel immediately asked to approach, and the court struck the argument and instructed the jury to disregard it. The court denied Mejia's motion for a mistrial but gave a curative admonition the next court day before the jury continued its deliberations.

The jury sent a note to the court stating it was deadlocked. The court questioned the jury and ordered it to continue deliberating, noting the jurors had been deliberating for only about five and a half hours. The jury then asked for readbacks of Cook's, Green's, and Carter's testimony. The court spoke to the jury, assured them they could have what they needed, but asked if they could specify a certain area of inquiry within the testimony.

The jury returned a verdict. The jury convicted Mejia of the hit-and-run, found true an allegation of personal infliction of great bodily injury, and acquitted her of an arson charge.

Mejia filed a petition seeking juror information, which the court granted.

The trial court denied probation, sentenced Mejia to the midterm of three years, and stayed the section 12022.7 enhancement.

Mejia argued the court must strike the conviction for personal infliction of substantial injury because substantial injury was an element of the offense itself. She also argued restitution was inappropriate because her flight had not exacerbated McGill's injuries. The court rejected both arguments and imposed a restitution obligation of $7,500.

## II

Mejia unsuccessfully attacks the judgment.

## A

The identification process did not offend due process. Mejia argues the trial court improperly allowed the jury to consider Cook's identification of Mejia. Identification evidence can offend a defendant's due process rights if the identification procedure is unduly suggestive and unnecessary. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989–90.) This one was not.

Mejia contends the fact that police showed Cook three six-packs demonstrates the procedure was fatally flawed, especially because Cook selected *two* photos in the first six-pack.

Showing a witness multiple line-ups or six-packs does not, by itself, establish undue suggestiveness. (*People v. Wilson* (2021) 11 Cal.5th 259, 286.)

The use of multiple six-packs made sense here because of Cook's reactions. The process of elimination ruled out suspects and eventually settled on an identification about which Cook was certain.

In the first six-pack, Cook was uncertain about the photos. She chose *two* people from the first six-pack, despite saying she

13

saw only *one* in the van.  Cook reinforced her uncertainty by commenting that photo number three looked "more like the person" she saw.  Photo three was of Mejia's brother, and the record does reveal a degree of family resemblance.

In the second six-pack, Cook rejected all six pictures.

In the third six-pack, Cook immediately selected Mejia.

This three-step process was acceptable.  When a witness is uncertain about an initial identification, it is reasonable for police to search for more reliable evidence by showing that witness pictures of other people.  Showing Cook 18 pictures instead of six, moreover, decreased the chance of random error.  This quest for certainty did not violate Mejia's rights.

Mejia's expert Dr. Eisen testified that showing a witness many six-packs introduces administrator bias and steering because it suggests the administrator is not satisfied with the first selection.  The jury rejected this view in this case, and so do we.  Cook was willing and able to say no when she recognized no one, as she demonstrated with the second six-pack.  Cook was certain about only one photo:  Mejia's.  Police did not point her to this particular photo.

Mejia also objects to the fact that the third six-pack contained *female* suspects when Cook originally said she saw a *male*.  People can err in drawing conclusions about the gender of others.  Cook illustrated this point the third time by making a confident selection immediately:  she picked Mejia's picture straightaway.  Changing the gender of people in the six-packs did not channel Cook to select Mejia.

Mejia argues the jury should have given more weight to the testimony of Dr. Eisen and should have distrusted Cook's

14

identification.  This contention was for the jury to resolve. (*People v. Manibuson* (2013) 58 Cal.4th 40, 87.)

In sum, Mejia has not impugned the propriety of this photo identification process.

With regard to Cook's in-court identification of Mejia, Mejia complains that Cook did not ask Mejia to take her mask off. Defense counsel questioned Cook about this choice, and the jury was able to weigh Cook's responses.  Leaving the mask on did not create undue suggestiveness.

B

Under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), defendants have an absolute right not to testify.  *Griffin* error arises if prosecutors comment on a defendant's choice to exercise that right.  Mejia argues a comment by the prosecutor constituted *Griffin* error and impaired the fairness of her trial.  We assume there was error and hold the assumed error was harmless.

During his closing argument, the prosecutor said the defense was going to paint Carter as the "big bad guy."  He told the jury, with our italics, to "remember [Mejia and Carter are] going through a custody battle at this time.  They're trying to figure out who gets [their daughter].  Sometimes we heard in testimony people make false allegations *during custody battles.  She never came into court and testified about domestic violence*.  There was never a conviction.  None of that ever happened.  But Erskine [Carter] did say it happened."

Where *Griffin* error occurs, courts must determine whether, beyond a reasonable doubt, the improper argument did not contribute to the verdict.  (*People v. Bloom* (2002) 12 Cal.5th 1008, 1055 (*Bloom*).)

This assumed error was harmless beyond a reasonable doubt. The prosecutor's comment was brief. (*Bloom*, *supra*, 12 Cal.5th at p. 1055 [noting in finding lack of prejudice that challenged comment was brief and not overt].) Jurors reasonably would have interpreted it, moreover, as related to a separate custody or domestic violence case and not to the criminal trial in which the jurors were participating.

Mejia argues that the prosecutor's comment was egregious given the importance of credibility in this case. A mass of evidence against Mejia, however, rendered this one sentence harmless beyond a reasonable doubt. There was no doubt the Mejia family van killed McGill; the parties stipulated to that fact. Of the possible drivers of that van, only Mejia made self-incriminating statements immediately after the event. Only Mejia was positively identified by Cook. Only Mejia told a friend "I'm guilty." Only Mejia had injuries consistent with the effects of a body crashing through the driver's windshield. Beyond a reasonable doubt, this sentence did not affect the verdict.

C

The prosecutor made an improper comment during rebuttal argument, but it did not prejudice Mejia because the trial court quickly and properly counteracted this inappropriate statement.

The improper comment was as follows. The trial court granted a motion in limine to prohibit mention of whether immediate medical assistance could have saved McGill's life. In violation of this in limine ruling, the prosecutor made the following statements in his rebuttal argument. The italics are ours.

"While [McGill] was on the side of the road, 12 minutes later, 12 minutes later she's texting her mom, not the police, not calling

16

the cops, not going back to the scene, not doing anything.  She left him there for an hour and 6 minutes.  She told Officer Loomis and Officer Hunt that she had no access to a phone, couldn't communicate, she was kidnapped, she was beaten, she was sexually abused.  We know that's not true.  We see her within minutes of this kid being killed, being run down, her doing everything she can to get out of it.

"He's not even declared dead until 2:52 at Centinela Hospital, *which means they transported him, which means they were trying, which means if someone had stopped and rendered aid, maybe, just maybe, and that should drive you nuts*."

Later, the trial prosecutor admitted that "by saying the maybe just maybe part of it, I agree with the court I went too far."  The court said "[t]hat argument very blatantly violated my court order."

When the prosecutor made this statement during the closing argument, defense counsel immediately asked to approach.  The court struck the argument and instructed the jury to disregard the prosecution's statement.

The jury deliberated for a few hours after the closing argument.  On the next court day, the court kept the jury from continuing to deliberate until a curative admonition was ready.  The court issued its admonition, which defense counsel helped craft, stating,

"I want to admonish you or advise you of the following: at the end of [the prosecutor's] final closing argument on Friday he referred to McGill's physical status.  On Friday I struck that argument and instructed you to disregard it.  There is absolutely no evidence before you that he was alive at any time after the collision or that paramedics were rendering aid or that he could

17

have survived his injuries. To be very clear, whether McGill would have survived is totally irrelevant. It was inappropriate for [the prosecutor] to make such an argument in violation of this court's order. As you were previously instructed, do not let bias, sympathy, prejudice, or public opinion influence your decision. As I instructed you on Friday, you are to disregard that statement in its entirety and not consider it for any purpose."

Mejia argues the prosecutor's comment was misconduct because it violated the court's order and because it improperly inflamed the jury's passions, which constituted prosecutorial misconduct. (See *People v. Crew* (2003) 31 Cal.4th 822, 839; *People v. Fields* (1983) 35 Cal.3d 329, 362–363.)

The trial court and the prosecutor both acknowledged this misconduct.

Misconduct will lead to a mistrial only where there is a reasonable likelihood the jury applied the complained-of comments in an objectionable fashion. (*People v. Hubbard* (2020) 52 Cal.App.5th 555, 562.)

The trial court correctly ruled this misconduct did not affect the fairness of the trial. The court immediately, clearly, and forcefully told the jury to disregard the bad statement. The curative admonition criticized the prosecution in no uncertain terms. As the court noted, the court's actions made it "look like [the prosecutor] was scolded . . . [and] it was basically, you know what, don't listen to what he just said."

Mejia argues the fact the jury found true the allegation about great bodily injury supports the idea that the jury did *not* disregard the prosecutor's improper statement. The evidence is to the contrary. Mejia's counsel sought to interview jurors after the verdict. With our emphasis, all jurors commenting on the

18

issue "stated *the jury did not discuss the misconduct* because they felt they were instructed not to do so."

Mejia argues the prosecutor's comment must have had a prejudicial effect because the case was close. The court's admonition, however, decisively countered prejudice from the prosecutor's improper statement. This factor could not have affected the verdict.

D

Mejia mounts an unsuccessful challenge to a sentencing enhancement the jury approved. This enhancement was from section 12022.7, subdivision (a), with our emphasis: "Any person who personally *inflicts great bodily injury* on any person . . . in the commission of a felony or attempted felony shall be punished . . . ."

The allegation was that Mejia's flight *from the scene* injured McGill beyond the trauma of the initial van impact.

Mejia argues no substantial evidence supports this jury finding, on the theory that McGill died instantly on impact, or more precisely that no evidence showed he did *not* die instantly. Mejia's logic is that the underlying offense consists of *departing* the scene, and her departure could not have injured a person who already was dead.

Mejia is right, and the prosecution agrees, that this enhancement cannot be based on the injury McGill suffered from the initial impact. The prosecution charged Mejia, not with striking McGill with a van, but with fleeing an injury accident without performing her necessary duties, such as assisting the injured. (Veh. Code, § 20003, subd. (a) ["shall render to any person injured in the accident reasonable assistance, including

19

transporting, or making arrangements for transporting, any injured person to a physician"].)

The illegal act "is not the 'hitting' but the 'running.' " (*People v. Corners* (1985) 176 Cal.App.3d 139, 148.)

We must determine whether a rational trier of fact could have found the allegation true beyond a reasonable doubt. We view the evidence favorably to the prosecution, and do not reweigh it. (See *People v. Jennings* (2010) 50 Cal.4th 616, 638.)

Substantial evidence supports the enhancement. When someone called police about the body in the street, paramedics rushed to the crime scene. They decided to transport McGill to a hospital rather than pronounce him dead on the spot or take him to a morgue. Viewing this evidence in the light favorable to the verdict, the reasonable inference is these medical professionals examined McGill and decided he was not dead.

The sooner a badly injured person gets medical treatment, the better the chances the treatment may relieve suffering and improve the odds of survival. As noted, the statute required Mejia to give McGill "assistance, including transporting, or making arrangements for transporting" him to medical care. (Veh. Code, § 20003, subd. (a).)

Given the standard of review, we accept this evidence McGill survived the van's impact and died only later, and that Mejia's failure to stop and help him get aid exacerbated his crash injuries. Mejia's no-substantial-evidence argument founders.

Mejia also remarks that, when the trial court scolded the prosecutor for violating its pretrial order, the court "explicitly told the jury" that no evidence showed McGill was alive after the collision. Mejia does not develop this remark as an independent legal contention, for she cites no legal precedents or reasoning to

support an argument this scolding warrants reversing the enhancement. This is forfeiture.

In a related vein, Mejia contends the trial court should have stricken the enhancement because great bodily injury already was an element of the underlying offense. Mejia forthrightly concedes *People v. Harbert* (2009) 170 Cal.App.4th 42, 59 (*Harbert*) is to the contrary and urges us to say *Harbert* was incorrectly decided. *Harbert*, however, has been on the books for 15 years. No published case has questioned its validity. We have examined *Harbert*. We do not depart from this well-reasoned and settled law.

Mejia attacks the use of CALCRIM 3160 in this case, saying it was too general as given and the court should have added more specificity to fit the facts of this case. Mejia concedes she did not object or offer more specific language at trial. A party may not complain on appeal that an otherwise correct instruction was too general or incomplete unless that party asked the trial court for appropriate clarifying language. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901 (*Covarrubias*).) The prosecution cited the authoritative *Covarrubias* decision in its respondent's brief. Mejia's reply does not address *Covarrubias*, which governs.

E

The trial court imposed restitution on Mejia. We affirm this award.

When, as here, the crime is leaving the scene of the accident without rendering aid, the trial court is authorized to order restitution for those injuries caused by the defendant's criminal flight from the scene. It is not authorized to award restitution for injuries from the accident itself. (*People v. Martinez* (2017) 2 Cal.5th 1093, 1098.)

21

The standard of proof at a restitution hearing is preponderance of the evidence, not beyond a reasonable doubt. We review a restitution order for an abuse of discretion. We will not reverse unless the order is arbitrary or capricious. (*People v. Shelly* (2022) 81 Cal.App.5th 181, 198–199.)

The emergency personnel at the scene took McGill to a hospital for medical care. They did not think his case was hopeless. The reasonable inference from this undisputed evidence is the professionals on the scene thought McGill might be alive. The trial court did not abuse its discretion.

## DISPOSITION

We affirm.


WILEY, J.

We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.

22